**KNIGHTS OF the KU KLUX KLAN, REALM OF LOUISIANA, Plaintiff-Appellant,**

**v.**

**EAST BATON ROUGE PARISH SCHOOL BOARD et al., Defendants-Appellees.**

**No. 76–2801.**

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1978.

Lawrence R. Anderson, Jr., Baton Rouge, La., John Reed, Gen. Counsel, ACLU of La., New Orleans, La., for plaintiff-appellant.

---

John F. Ward, Jr., Baton Rouge, La., for East Baton Rouge Parish School Bd.

Robert S. Leake, Asst. U. S. Atty., Baton Rouge, La., William H. Taft, IV, Gen. Counsel, George Lyon, Atty., Arline Mendelson, Dept. of H. E. W., Drew S. Days, III, Asst. Atty. Gen., Civ. Rights Div., Dept. of Justice, Washington, D. C., for U. S. Dept. of Health, Ed. and Welfare.

Before TUTTLE, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

As of November 1975, defendant East Baton Rouge Parish School Board (Board) maintained a standing policy of allowing outside organizations to use school facilities for meetings and gatherings during non-school hours. Permission was granted on a first-come, first-serve basis, on condition of a modest rental and the payment of any overtime custodial or janitorial expenses occasioned. In granting permission for such use, no distinction between applicants was made on the basis of their political or ideological views, and organizations holding a variety of such views had in the past availed themselves of school facilities.

Early that month plaintiff-appellant, Knights of the Ku Klux Klan, Realm of Louisiana (KKK), a Louisiana nonprofit corporation chartered August 8, 1975, applied in due form for use of a high school gymnasium to hold what it termed a patriotic meeting on the night of Saturday, November 22. By letter of November 17, the Board granted permission for the meeting.[1] This letter was received by KKK on the following day, or shortly thereafter, and matters proceeded. This letter, together with the other communications between the parties to which we shall refer, will be found in the appendix to this opinion, as an exhibit to the factual stipulation of the parties printed there in full.

But the planned meeting was not to be, for wind of it had come to the Branch Office for Civil Rights[2] of the United States Department of Health, Education and Welfare in Dallas, Texas. On November 19, Dr. John A. Bell, Branch Chief in Dallas, telephoned the Board, confirming by telegram, that permitting use of school facilities for such a meeting would violate certain regulations[3] promulgated pursuant to the Emergency School Aid Act, 20 U.S.C. § 1601 *et seq.* (ESAA). These regulations, partly quoted in the wire, denied federal funds to any educational agency permitting use of its facilities by a group "which discriminates against minority group children aged 5 to 17 inclusive, in its admissions or membership policies, or otherwise practices . . . discrimination against such children on the basis of race, color, or national origin . . . ." Dr. Bell's telegram continued with threats that if the KKK meeting were permitted he would "constitute [sic] enforcement proceedings seeking the termination of all ESAA funding to your district" and that the use would also violate Title VI and thus "trigger an enforcement action . . . to end all federal financial assistance to your district." The next day, November 20, faced with the loss of annual payments in the millions, the Board withdrew its permission for KKK to use the gymnasium.

The following day Dr. Bell, having observed the effect of his barrage, attempted a partial unfiring of the guns. In a wire to the Board, he suggested that the first amendment, as well as ESAA and Title VI, might be seen as cutting some figure in the Board's decision and that the Board should consider it too in determining what course to follow. He stated also that if the first amendment *required* that KKK's use be permitted, such a use could not be grounds for enforcement action under any federal

---

1. A communication not without its ironies, advising as it did "that the burning of crosses on school premises is strictly prohibited . . ."

2. As noted, the record contains ironic features.

3. 45 C.F.R. 185.43(d)(3).

program. Thus, the Board was left to re-determine correctly, in a maximum of two days and arguably at its peril either way, the difficult issues with which we grapple today. Not surprisingly, it sat steady in the boat and took no action to reverse the cancellation.

Indeed, at the same meeting at which it had cancelled the KKK meeting the Board had also declared a moratorium on further use of school facilities by outside private organizations pending the fashioning of a new policy designed to avoid both the first amendment Scylla and the HEW Charybdis. And several months later, on February 19, 1976, the Board adopted its present policy. That policy, pertinent portions of which are set out in the Appendix, frankly discriminates among applicants on the basis of the content of the ideas they advocate and, arguably, on their membership and meeting-attendance policies. Among those excluded from use of the facilities are groups advocating racial discrimination, as KKK admittedly does. Plaintiff immediately amended its complaint to attack the new policy on first amendment grounds, as stigmatizing particular political preferences or beliefs and as "chilling" rights of freedom of speech, assembly and association.

At a hearing on April 20, 1976, the district court denied the preliminary and permanent injunctions requested by plaintiff against application to it of the new policy; ruled that the policy did not violate equal protection or improperly deny rights of speech, assembly or association; and dismissed the suit in its entirety. In so doing, the court observed from the bench that the facts in the case were stipulated and not in dispute. It also enunciated, as the basis for its ruling, its conclusion that while such views as the Board's new policy prohibited were constitutionally protected in their expression in any place "made public for multiple or general purposes," public school buildings were a special case. The court went on to state its belief that such views were contrary to the law of the land and that the Board could properly conclude and adopt as a policy that permitting the advocacy of such ideas on premises built and

used for educational purposes might have a detrimental effect on the orderly use of them for these primary purposes.

We are thus presented on this appeal with one basic issue, our resolution of which would be dispositive: may an agency of the state, consistently with the Constitution, condition the off-time use of public school facilities on the political or ideological views of the applicant, on its membership policies, or perhaps on who may be permitted to attend its proposed function?

### Preliminary First Amendment Considerations

■ Our analysis first requires us to apply to the particular facts of this case the general "public forum" doctrine enunciated by the Supreme Court in *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):

The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. *The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.* Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest.

408 U.S. at 116–17, 92 S.Ct. at 2303–04 (footnotes omitted) (emphasis added).

This is not difficult; indeed, the Board has resolved this matter for us by historically permitting, on a continuing and indifferent basis, the use of these facilities during non-school hours by private organizations. Thus, it would be difficult for the Board or any other party to maintain that after-

school meetings and similar activities in the facilities concerned interfere, as a general proposition, with their use or are inappropriate to it.

### Further First Amendment Contentions

■ Though we have ascertained that we treat of a facility dedicated to such uses as that proposed by KKK—a public forum for such purposes—appellees would have it that our first amendment inquiry is not concluded. They seek to distinguish use of the facilities by KKK from uses by other groups on several grounds: that such a use would hinder desegregation efforts, that the KKK meeting might lead to violence, that KKK is a "segregated" organization (in the sense that only whites may join), and that the rally may not have been open to all racial segments of the public.

Unfortunately for appellees' position at this stage of the proceedings, however, none of these contentions was advanced below. Nothing in any of appellees' pleadings so much as suggests any of them, nor did any appellee advance any of them in the reported arguments before the court below. No evidence was offered in their support, and such indications regarding them as may be found in the factual stipulation of the parties tend, with one exception (that KKK has never had a Negro member), to negative rather than to establish them. Thus, the contentions are entitled to little if any consideration by us now. On the remand which we order for trial on the merits, appellees may, of course, advance and seek to establish them to the extent that they are relevant to that proceeding as it develops. Appellees indeed urge such a remand, while appellant KKK urges that we declare the Board's new policy unconstitutional and permanently enjoin appellees from denying appellant use of the school facilities on the basis of it. As in *Cason v. City of Jacksonville,* 497 F.2d 949 (5th Cir. 1974), however, we are loath to adjudicate such grave constitutional issues on their merits when the factual development of the case is so sketchy. A remand for more full development seems the more prudent course. As

we have determined to follow that course, we must now decide in what posture the matter should rest pending that hearing on the merits. Should a preliminary injunction issue?

### Temporary Injunctive Relief

■ Granting such relief requires that appellant have shown: (1) a substantial likelihood that it will prevail on the merits; (2) irreparable injury unless the injunction issues; (3) that the threatened injury to it outweighs whatever damage the injunction may cause the parties opposing it; and (4) that granting the injunction would not be against the public interest. *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir. 1974). None of these factors possess a fixed quantitative value; they are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others. *Texas v. Seatrain International S.A.,* 518 F.2d 175 (5th Cir. 1975); *Siff v. State Democratic Executive Committee,* 500 F.2d 1307 (5th Cir. 1974). We consider the factors in the order given above.

1. *Substantial Likelihood of Prevailing on the Merits.* The Board's new or current policy contemplates that in comparable circumstances it will make school facilities available to some private groups and deny them to others. Generally speaking, equal protection considerations render such selective exclusions unconstitutional. *See* Stone, *Fora Americana: Speech in Public Places,* 1974 Sup.Ct.Rev. 233, 255 n.85.

In this case, our doubts about the constitutionality of the Board's policy are heightened by the touchstones which it selects for exclusion: advocacy of racial and religious discrimination or of governmental overthrow by force or violence is the first, without reference to the manner or setting of the advocacy or so much as a nod to the "clear and present danger" doctrine. This reason for exclusion is almost surely unconstitutional. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

Discriminatory membership policies of the applying group is the second. But, as we shall discuss at length later, it seems very dubious that such a consideration may be applied to deny the use for a few hours of a dedicated public forum, *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973), or that a measure so directly contravening freedom of association could withstand the "close" scrutiny prescribed for such by *Gilmore v. City of Montgomery,* 417 U.S. 556, 575, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). Finally, the Board's policy may perhaps be read as requiring denial of use of school facilities for meetings which will be opened to the public on a racially or other invidiously discriminatory basis. *See Cason v. City of Jacksonville,* 497 F.2d 949 (5th Cir. 1974). The difficulty with applying this criterion to KKK's proposed meeting is that there is in the record no evidence whatever that the meeting would have been of this type. To the contrary, the meeting for which the Board cancelled use of its facility was stipulated by all parties to have been "scheduled, advertised and planned to be a public meeting, without any restriction on admittance." And the same is true of the appellees' belated contention that the meeting would have contemplated or occasioned violent conduct; the same stipulation states that the cancelled meeting "was scheduled, advertised and planned to be a completely peaceful meeting." Likewise, HEW's argument that KKK's after-hours use of the gymnasium will impede desegregation of the parish schools is supported by no evidence.

2. *Irreparable Injury.* KKK has been denied for almost three years the use of a public forum available to most others. This denial rests on a policy which is, as we have noted, of very dubious constitutionality. Citing language from *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965),[4] appellees suggest that KKK's first amendment rights have not been much impaired since it has merely been denied the use of a particular forum of its choice at the particular time it desired it. Of course, a more accurate statement would be that the Board's policy denies and has denied to KKK the use of *any* school facility at *any* time. And long before *Cox,* the Court had declared that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). The Court has since found occasion to reaffirm this proposition in several opinions, *e. g., Spence v. Washington,* 418 U.S. 405, 411 n.4, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Grayned v. City of Rockford,* 408 U.S. 104, 118 n.40, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). And as we have noted, the Board seems to concede that the gymnasium in question, after hours, is an "appropriate" place for the expression of most views, so that we do not deal with the situation of one who insists on a right to address a library reading room or to hold a mass meeting at a public intersection during rush hours.

Moreover, there are hints from the Court, *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and holdings from lesser tribunals, *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); *Cobb v. Beame,* 402 F.Supp. 19 (S.D.N.Y.1975), that denial of first amendment rights may in itself constitute irreparable injury in some circumstances. Certainly the denial here is broad and lengthy, as much so as lies in the Board's powers. Having by its new policy denied use of any of its facilities to KKK forever, it can do no more.

We conclude that this prior restraint on the exercise of first amendment rights in a dedicated public forum—being severe, broad and longlasting—may properly be viewed as inflicting irreparable injury.

3. *Balancing the Relative Injuries.* We have noted above the injury suffered by KKK as a result of the Board's likely unconstitutional policy regarding use of its facilities. If the policy is in fact invalid, then KKK is and has for almost three years been improperly barred from exercising its

---

4. The *holding* of which can scarcely give appellees much comfort.

first amendment rights in a generally available public forum. We cannot regard such selective muzzlings lightly; to the contrary, in our constitutional scheme of things they are viewed very gravely indeed.

HEW and the Board can muster little to cast in the balance's other pan. As for the Board, it seems plain that but for Dr. Bell's threats of financial ruin the November 22, 1975, meeting would have gone off like any other and there would have been no such policy at all. And as for HEW, it advances only a supposed interference with its capability to enforce "statutes which proscribe racially discriminatory *acts* (emphasis supplied) that may undermine school desegregation." There being little or no evidence in the record that any such act—unless the peaceful advocacy of ideas that someday, somehow may eventuate in one be such— would ensue upon use of the forum in question by KKK, we are not much impressed by this contention.

4. *Would an Injunction be Against the Public Interest?* Several public interests are involved here. The first is that unfashionable, even pernicious and mischievous, ideas should be admitted to the marketplace. A more futile exercise in redundancy can scarcely be imagined than the citation of authority in support of this proposition. The state may require that the vending of such wares be peaceable, it may pray fervently that no one will buy them; what it may not do is exclude them from the public forum by a prior restraint, as it is all too plain appellees have sought to do in this case:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . . . If there are any circumstances which permit an exception, they do not now occur to us.

*West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (footnote omitted). *See also Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978). The benefits of the first amendment are often hard to see, its gifts frequently unwelcome to the majority of the time, but the interest that thinks to make head against it must be a compelling one indeed.

Against this policy appellees would range two others: that in prohibiting racially discriminatory acts which may impede desegregation and that in avoiding any state involvement in forwarding KKK's invidious racial views. These too are weighty considerations, but if they are much involved here appellees have not shown it.

As we observed above, such evidence as is in the record indicates that KKK's proposed and cancelled meeting—the only one about which there is any evidence—was to have been open to the public generally. It is true that the record contains an indication that KKK has a discriminatory membership policy: no Negro has ever been a member in the corporation's three-year history.[5] But if this policy, assuming it exists, be the discriminatory "act" to which HEW refers, it is hard to see how the Board's facility-use policy could affect it.

A more logical concern is that the state, in the person of the Board, might be seen as acting to forward KKK's views and policies by permitting any use of its facilities by such an organization. It is certainly true that significant state action in support of such things is prohibited, *e. g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (leasing of state-owned restaurant area for exclusive use by discriminating operator); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (discriminatory primary held by dominant political party); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state enforcement of private racial covenants).

But the weight of authority seems to be that merely permitting the occasional and temporary use of state facilities by racially discriminatory groups along with all others does not constitute significant state involve-

5. One may well wonder why any would wish to.

ment in their practices. For though the state must not be significantly involved in forwarding such practices, at the same time it is not its place to anathematize private groups which pursue them. At some level of minor state involvement, considerations of freedom of association become paramount. Bigots, even groups of bigots, may not be outlawed for their behavior—excluded from use of public sewers, streets or fora, or denied fire or police protection. As the Court observed in *Moose Lodge v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), "[t]he Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State . . . ." And in *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), a case not involving freedom of speech, the Court distinguished what amounted to a making over of entire public recreational facilities to the exclusive possession of segregated private groups from lesser state actions. Though it invalidated the former, it cautioned that the exclusion of any group, "all-Negro, all-Oriental, or all-white," from public facilities infringes freedom of association and "must withstand close scrutiny." 417 U.S. at 575, 94 S.Ct. at 2427.

We conclude that enjoining a selective denial of a dedicated public forum to a group because of its ideas or membership policies would forward and not contravene the public interest. Properly analyzed, there is simply *no* state involvement here in KKK's ideas or practices, whatever they

may be, and no state action endorsing them. For here, the decisive action of the state was an indifferent one, analogous to dedicating a public park: it threw open the doors of the gymnasium in question for after-hours use by all comers, on a first-come, first-serve basis. Thereafter, its only additional function was the housekeeping one of scheduling—determining who came first to apply for a particular time. *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973). Thus, the state is here no more involved in or responsible for the views expressed or for the composition of the groups which express them in the forum which it created than the United States is in who makes speeches or holds demonstrations on the Mall. Instead, it is appellees who would have the state take a hand in the matter by franking those whose ideas and policies it finds suitable for public expression and gagging those it does not—and this in the name of equal protection and civil rights. We do not find this an attractive suggestion.

### Conclusion

We conclude that this case was improvidently dismissed on its merits, and we therefore remand it for trial. We further conclude, since appellant has for the present sufficiently established the four factors required for a temporary injunction under *Canal Authority, supra,* that such an injunction must issue forthwith against enforcement of the Board's policy against appellant KKK, pending the hearing on the merits. The cause is

REVERSED AND REMANDED.

## APPENDIX

### STIPULATION OF FACTS

(Number and title omitted) (Filed:April 20, 1976)

Now into Court, comes plaintiff herein, Knights of the Ku Klux Klan, Realm of

Louisiana, and all defendants herein, East Baton Rouge Parish School Board, Donald D.

APPENDIX—Continued

Hunt, Mrs. Wallace Armstrong, H. E. Aull, A. Bridger Eglin, L. L. Hines, Ben H. Peabody, George H. Richard, W. W. Wells, J. O. Claudel, Martial J. LaFleur, Jr., Randall Goodwin, T. H. Montgomery, Robert Aertker, Thomas Holliman, John A. Bell, David Matthews and the Department of Health, Education and Welfare, United States of America, through undersigned counsel of record, who hereby stipulates to the following facts for the hearing on the motion for preliminary injunction requested by plaintiff, as follows:

1.

Plaintiff, Knights of the Ku Klux Klan, Realm of Louisiana, is a non-profit Louisiana corporation, domiciled in East Baton Rouge Parish, Louisiana. Mr. David Duke is the national director of the Knights of the Ku Klux Klan, Realm of Louisiana, and has responsibility for making day-to-day decisions respecting that organization. Defendant, East Baton Rouge Parish School Board, is domiciled in the Parish of East Baton Rouge, State of Louisiana, and is an agency of the State of Louisiana. At all material times herein, and particularly on November 4, 17, 19, 20, 21 and 22, 1975, and continuing to date, the East Baton Rouge Parish School Board has owned the public school facility known as Belaire High School, at 12121 Teams Drive, in Baton Rouge, Louisiana, and/or has had the responsibility of operating that facility. Defendants, Donald D. Hunt, Mrs. Wallace Armstrong, H. E. Aull, A. Bridger Eglin, L. L. Hines, Ben H. Peabody, George H. Richard, W. W. Wells, J. O. Claudel, Martial J. LaFleur, Jr., Randall Goodwin, and T. W. Montgomery all are domiciled in the Parish of East Baton Rouge, State of Louisiana, and all are duly elected members of the East Baton Rouge Parish School Board. Defendant, Robert Aertker, is domiciled in the Parish of East Baton Rouge, State of Louisiana and is the Superintendent for the East Baton Rouge Parish School Board. Defendant, Thomas Holliman is domiciled in the Parish of East Baton Rouge, State of Louisiana and is the principal of Belaire High School.

1130 

## 2.

On November 4, 1975, Mr. David Duke, on behalf of the Knights of the Ku Klux Klan, Realm of Louisiana, applied for the use and/or rental of the Belaire High School, for November 22, 1975, from the times of 7:00 o'clock p.m. to 11:00 o'clock p.m., for use of the gymnasium, for a patriotic meeting, with the fee for the use of the facility to be $40.00 and the overtime pay for any custodian, janitor, or school lunch to be $17.00 per hour, on a form "Request for Use of School Building Facilities" provided to him by the East Baton Rouge Parish School Board, through one of its authorized representatives. On that same date, Mr. Thomas Holliman, Principal of Belaire High School, signed the application indicating that no other person or group had requested the use of the gymnasium for that date and time. Mr. Holliman forwarded the application to Mr. Robert Aertker, for Mr. Aertker's approval, which application is attached hereto as Exhibit "A".

## 3.

On November 17, 1975, Mr. Robert Aertker, Superintendant for the East Baton Rouge Parish School Board, sent a letter addressed to Mr. David Duke, by registered mail, return receipt requested, advising Mr. Duke that he had been granted the use of the Belaire High School for the meeting requested on November 22, 1975. A true and correct copy of that letter is attached hereto as Exhibit "B". Mr. Duke received this letter, identified as Exhibit "B", on November 18, 1975, or shortly thereafter.

## 4.

On November 19, 1975, Dr. John A. Bell, Branch Chief, Elementary and Secondary Education Branch Office for Civil Rights, Region VI, Department of Health, Education and Welfare, Dallas, Texas, called by telephone Dr. Lorin Smiley, Assistant Superintendant for the East Baton Rouge Parish School Board, and advised that the use of the public school facilities of East Baton Rouge Parish by the Knights of the Ku Klux Klan would

constitute a violation of ESAA regulations that if the East Baton Rouge Parish School Board allowed the Ku Klux Klan to use the public school facilities, that the Department of Health, Education and Welfare would institute enforcement proceedings seeking a termination of all ESAA funding and an enforcement action to end all federal financial assistance to the East Baton Rouge Parish School Board. This telephone conversation was confirmed by telegram dated November 19, 1975, sent by Mr. John A. Bell to Dr. Lorin Smiley, which telegram was received by Dr. Lorin Smiley either on November 19 or November 20, 1975. A true and correct copy of this telegram is attached as Exhibit "C".

5.

On November 20, 1975, the East Baton Rouge Parish School Board at an official meeting of its regular session, a quorum being present, by majority vote, rescinded and cancelled its approval that the Knights of the Ku Klux Klan, Realm of Louisiana, use and/or rent the gymnasium facility of the Belaire High School for Saturday night, November 22, 1975. This action, by the East Baton Rouge Parish School Board was prompted at least in part by the communications it received from appropriate officials of the Department of Health, Education and Welfare that all federal funding to the school board would be terminated, if the school board allowed the Knights of the Ku Klux Klan, Realm of Louisiana, to use and/or rent the public school facility for November 22, 1975, or any other time.

6.

The meeting scheduled by the Klan for Saturday night, November 22, 1975, was scheduled, advertised and planned to be a public meeting, without any restriction on admittance. This meeting was scheduled, advertised and planned to be a completely peaceful meeting.

7.

The actions of the authorized representatives of the Department of Health, Education and Welfare at least in part caused the East Baton Rouge Parish School Board, to adopt a policy at its regularly scheduled meeting on or about November 20, 1975, imposing a moratorium on the use and/or rental of public school facilities by any person or organization for non-educational purposes, for a period of two weeks or until further resolution of this situation.

8.

Prior to the actions of the Department of Health, Education and Welfare, through its authorized representatives, on November 19, 1975, and the actions of the East Baton Rouge Parish School Board on November 20, 1975, the school board had consistently permitted the use and/or rental of its public school facilities to many groups and organizations, representing various and different purposes and view points. At no time, prior to the actions by the school board in rescinding approval of the use and/or rental of the Belaire High School facilities to plaintiff herein, did plaintiff or any of its members fail or refuse to comply with any policy or regulation of the East Baton Rouge Parish School Board as to the use of the facilities, and at no time threatened to fail or refuse to comply with these policies or regulations.

9.

The actions of the Department of Health, Education and Welfare and the East Baton Rouge Parish School Board caused plaintiff to seek other facilities for the public meeting scheduled for Saturday night, November 22, 1975. The meeting on November 22, 1975, was held outside of plaintiff's relatively small headquarters or office on Airline Highway in Baton Rouge, Louisiana in rather cold weather. At the last public meeting scheduled by plaintiff prior to November 22, 1975, a crowd of approximately three thousand (3,000) people attended in Walker, Louisiana.

10.

On or about November 21, 1975, at approximately 6:17 p.m. Eastern Standard Time, Dr. John A. Bell sent a telegram to the "East Baton Rouge Parish Schools", care of Dr. Lorin Smiley, Assistant Superintendent. A true and correct copy of that telegram is attached hereto as Exhibit "D". This telegram, identified as Exhibit "D", speaks for itself.

11.

The Knights of the Ku Klux Klan, Realm of Louisiana, is a non-profit Louisiana corporation organized under the laws of Louisiana. Its articles of incorporation, by-laws or any other rules and regulations of that organization contain no restrictions on membership as to race, religion, sex or national origin. A true and correct copy of plaintiff's articles of incorporation is attached as Exhibit "E". At all material times herein, and continuing to date, all of the members of the Knights of the Ku Klux Klan, Realm of Louisiana, have been members of the Caucasian race, and that organization does not and has never had any members of the Negro race.

12.

On Thursday, February 19, 1976, the East Baton Rouge Parish School Board at a regularly scheduled meeting, a quorum being present, by a majority vote, adopted a new policy of rental or use of public school facilities, which prohibits renting or using of the public school facilities by organizations that discriminate in their membership or that would conduct activities in rented school facilities to advocate the deprivation of any constitutional or lawful rights of any person because of that person's race, color, creed, sex, religious or political preference, or to deride or ridicule any other person because of that person's race, creed, sex, religious or political preference or beliefs and which also prohibits the rental or use of public school facilities for any meeting, program, or other activity, the primary purpose of which is the personal, financial or pecuniary benefit of

1134

such person. The policy adopted by the school board permits regularly employed persons of the school system to conduct enrichment programs if approval is first obtained from the Superintendent's office and provided that funds derived from these activities are turned into the school board according to school board policy.

SO SIGNED AND STIPULATED,
THIS 13th DAY OF APRIL, 1976.

s/ John F. Ward, Jr.
JOHN F. WARD, JR. (T.A.)
Attorney at Law
770 North Street
Baton Rouge, Louisiana
Telephone: (504) 387-0858
Attorney of Record for Defendants,
East Baton Rouge Parish School
Board, Donald E. Hunt, Mrs.
Wallace Armstrong, H. E. Aull,
A. Bridger Eglin, L. L. Hines,
Ben H. Peabody, George H.
Richard, W. W. Wells, J. O.
Claudel, Martial J. LaFleur, Jr.,
Randall Goodwin, T. H.
Montgomery, Robert Aertker,
and Thomas Holliman

SO SIGNED AND STIPULATED,
THIS 20th DAY OF APRIL, 1976.

s/ Robert S. Leake
ROBERT S. LEAKE (T.A.)
Assistant United States Attorney
United States Courthouse
707 Florida
Baton Rouge, Louisiana
Telephone: (504) 837-0181
Attorney of Record for Defendants,
John A. Bell, David Matthews and
the Department of Health, Education
and Welfare, United States of
America

SO SIGNED AND STIPULATED,
THIS 13th DAY OF APRIL, 1976.

s/ Lawrence R. Anderson, Jr.
LAWRENCE R. ANDERSON, JR.
Anderson & Roberts,
Attorneys at Law
1976 Wooddale Boulevard
Baton Rouge, Louisiana 70806
Telephone: (504) 927-1064
Attorney of Record for Plaintiff,
Knights of the Ku Klux Klan,
Realm of Louisiana

EXHIBIT A

## REQUEST FOR USE OF SCHOOL BUILDING FACILITIES

To: Superintendent Date Nov. 4, 1975

Request is hereby made for the use of the following school building facilities at the

Belaire High School, on the date (s) and at the time (s) shown below:

Date (s) 11/22/75 Time (s) 7:00PM to 11:00 PM

### CHECK FACILITY REQUESTED (X):

☐ Auditorium ☐ Kitchen and Dining Area

☐ Gymnasium ☐ Dining Area only

☐ Classroom ☐ Other (describe)

☐ Clinic or similar facility

Purpose for which the facility is to be used: _____Patriotic Meeting_____

It is hereby agreed in connection with the use of the school building facilities that the

organization or person applying for the use thereof will:

(a) Pay for any damage done to buildings, equipment, or grounds.

(b) Take reasonable means to prevent smoking or drinking of alcoholic beverages in

the building.

(c) Waive any and all rights to recovery from the East Baton Rouge Parish School

Board for any injuries or damages resulting from the use of school building

facilities hereunder.

(d) Pay the school the amount necessary to cover overtime pay for custodial and/or

school lunch employees. The hourly rates are prescribed in the handbook.

(e) Agree that the Principal or the Superintendent reserves the right to cancel a

previous commitment to rent this facility in the event it is necessary to use it for

school purposes.

The applicant understands that the fee for use of this facility is $40.00

Overtime Pay (Custodian, Janitor, School Lunch). . . $17.00 per hour

1136 

Name of organization David Duke — Knights of the Ku Klux Klan

Signature and title of official s/ David Duke National Director

 Date 11/4/75

 The use of the above described school building facilities on dates indicated will not

interfere with operations of this school and does not conflict with the present school

Board regulations.

 s/ Thomas Holliman
 THOMAS HOLLIMAN
 Principal

(SEND ALL FIVE (5) COPIES TO SCHOOL BOARD OFFICE FOR APPROVAL)

 Date 11/4/75

To: Principal of Belaire High School and Applicant

The above request is approved (disapproved).

 EXHIBIT B
 EAST BATON ROUGE PARISH SCHOOL BOARD
 P.·O. Box 2950
 Baton Rouge, Louisiana 70821

 November 17, 1975

REGISTERED MAIL

RETURN RECEIPT REQUESTED

Mr. David Duke

Patriot Press

11595 Sewanee Drive

Baton Rouge, LA 70816

Dear Mr. Duke:

 The purpose of this communication is to advise you that you have been granted the

use of the Belaire High School for a meeting at which you indicate that you will have

speakers.

This is to advise that the burning of crosses on school premises is strictly prohibited, and you are requested to be guided accordingly.

Sincerely yours,

s/ Robert J. Aertker

ROBERT J. AERTKER
Superintendent

EXHIBIT C.

Nov. 19 15 32 '75

C53119 CHLDP

RAAUIJAZ RUCHLAE 6 3232103-UUUU-RUCHLOP.

HWOR

FM John A. Bell, Chief Elem. & Sec. Ed. Br Office of Civil Rights Region VI DHEW Dallas TX

TO Mr. Lorin Smiley, Asst. Supt. East Baton Rouge Parish School Board Baton Rouge, LA

BT

This is confirm our telephone conversation of this morning Nov. 19, 1975 concerning the use of your public school facilities by a chapter of the KKK scheduled for Nov. 27, 1975. As we advised in our conversation today, the use of your facilities by the subject organization will constitute a violation of the condition which permits the continuation of your ESAA funding. The ESAA regulations provide the following:

"(D) Discrimination against children

- - - - - - - - - - - - - - - - - - - - - - - - -

No educational agency shall be eligible for assistance under the (ESAA) act if, after June 23, 1972, it has had or maintained in effect any procedure, practice, policy, or procedure, which results or has resulted in discrimination against children on the basis of race, color, or national origin, including but not limited to:

(3) Permitting the rental, use, or enjoyment of any of such agency's facilities or services by any group or organization which discriminates against minority group children aged 5 to 17 inclusive, in its admissions or membership policies, or otherwise practices, or permits to be practiced, discrimination against such children on the basis of race, color, or national origin: . . . . .

(45 CFR 185.43 (D) (3))

This telegram constitutes official notice that if you permit this use by the KKK to occur you will leave this office no alternative but to constitute enforcement proceedings seeking the termination of all ESAA funding to your district.

We are also obligated to inform you that this anticipated use of your facilities constitutes a violation of Title VI of the Civil Rights Act of 1964 (48 USA 2000 D) and associated regulations (45 CFR part 80) and will also trigger an enforcement action under that part to end all federal financial assistance to your district.

BT

NNNN
(53119 CHLDP

CONFIRMATION COPY

This is a confirmation copy of a message telephoned to Mr. Heno on Nov. 19, at 4:19 p.m.

General Services Administration, Transportation and Communications Services

ExL 6644 or 527-6644

Message telephoned by:

EXHIBIT D

Nov. 21, 1975 18 17

Dr. Lorin Smiley Assistant Superintendent
East Baton Rouge Parish Schools
P. O. Box 2950
Baton Rouge, Louisiana 70821

Dear Dr. Smiley:

It is my understanding that on November 20 the East Baton Rouge Parish School Board rescinded the previous approval of the request by the Knights of the Ku Klux Klan for the use of a public school facility on November 22. I further understand that this action was taken at least in part as a result of my telegram to you of November 19. In order that the November 19 telegram be properly understood. I should like to point out that the emergency school aid act (ESSA) regulatory provision cited therein (45 C.F.R. 135.43) (d) (3)) must be read in the context of court decisions relating both to racially discriminatory state action and to First Amendment guarantees of free speech and assembly. Decisions in the state action area, or course, lend support to the implementation of the ESAA statutory prohibition against discrimination, set out at 45 C.F.R. 135.43 (D) (3)). At the same time, that regulation cannot be read to authorize conduct constituting an impermissible abridgement of First Amendment rights: and no use of your school districts facilities requiped to be approved under the First Amendment would be grounds for enforcement action under the ESAA or any other federal program.

In assessing your obligations under the First Amendment with regard to making available public school facilities to groups and individuals outside the school system, you may wish to refer to two recent federal cases. (National Socialist White Peoples Party v. Ringers, 473 F. 2D 1010. 4th Cir., 1973) Cason v. City of Jacksonville, 497F.2D 949 (5th Cir., 1974) and a recent law review article (3) Washington and Lee L. Rev., 107, 120-128 (1974)). While we cannot determine the proper course of action for your school district without a full appraisal of the facts, that course should be determined after

consideration of the district's obligations under the First Amendment as well as constitutional and statutory bars against racial discrimination.

John A. Bell, Chief, Elementary and Secondary Education Branch Office for Civil Rights, Region VI .

EXHIBIT E

## CHARTER OF
## KNIGHTS OF THE KU KLUX KLAN, REALM OF LOUISIANA

United States of America
State of Louisiana
Parish of East Baton Rouge

BE IT KNOWN, That on this 8th day of August, in the year of Our Lord one thousand, nine hundred and seventy-five, in the presence of the witnesses hereinafter undersigned, David Ernest Duke, of the full age of majority, did declare that, availing himself of the benefits and provisions of the Constitution of the State of Louisiana and the laws os said State relative to the organization of non-profit corporations, and particularly of the provisions of R. S. 12:201-269 incl., as amended, and Title 12, Chap. 2, Para. 202, he does by these presents form and organize a non-profit corporation for the objects and purposes and under the covenants, stipulations and agreements following, to-wit:

ARTICLE I

The name and title of this corporation shall be KNIGHTS OF THE KU KLUX KLAN, REALM OF LOUISIANA, and under and by said name, unless sooner dissolved in accordance with law, it shall exist and continue, and shall have and enjoy perpetual corporate existance and succession, during which time it, generally shall possess all of the powers, rights, privileges, capacities and immunities which non-profit corporations are authorized, and may be hereafter be an authroized to possess under the Constitution and

laws of this State, and particularly under Title 12, Sec. 201 as amended, et seq., Louisiana Revised Statutes.

The emblem shall be the cross-circle:

## ARTICLE II

The domicile of this corporation shall be East Baton Rouge Parish, State of Louisiana, and the location and post office address of its registered office shall be: 11595 Sewanee Drive, Baton Rouge, LA 70816

## ARTICLE III

This corporation is organized to bring peace, harmony and prosperity to these United States of America and her people, and to advance the cause of fraternity, education and charity to all Americans.

## ARTICLE IV

This corporation is a non-profit corporation.

## ARTICLE V

The officers of this corporation shall consist of a National Director, a National Information Director, an activities officer, a Klan secretary and a treasurer. Any two or more offices may be held by the same person, except the office of National Director and Klan secretary. All officers are to be elected annually by the membership and shall serve for one year or until their successors are duly elected and installed.

The names and address of the present officers are:

National Director: David Ernest Duke

Klan Secretary Chloe Hardin Duke

11595 Sewanee Drive, Baton Rouge, LA 70816

The remaining officers will be elected and installed subsequent hereto.

Election of officers (who shall then automatically become members of the board of directors) shall be each Sept. 1st, beginning Sept. 1, 1975.

**1142**

## ARTICLE VI

The board of directors shall consist of the same persons who are officers of this corporation and the terms of office on the board of directors shall be concurrent with their terms as officers of this corporation.

Election to and installation as a member of the board of directors shall simultaneous with election and installation as an officer of this corporation.

## ARTICLE VII

The corporate powers and management of this corporation shall be vested in, and exercised by the officers of this corporation, which as set out hereinabove, is identical with the board of directors.

## ARTICLE VIII

The full name and post office address of the corporation's registered agents are:

David Ernest Duke, 11595 Sewanee Drive, Baton Rouge, LA 70816

Chloe Hardin Duke, 11595 Sewanee Drive, Baton Rouge, LA 70816

## ARTICLE XI

The name and address of the incorporator is:

David Ernest Duke, 11595 Sewanee Drive, Baton Rouge, La 70816

## ARTICLE X

This corporation is organized on a non-stock basis. All decisions shall be made by the founding membership.

## ARTICLE XI

The founding membership shall consist of one and only one person, David Ernest Duke, the founding member.

## ARTICLE XII

The name and address of the subscriber to these Articles of INcorporation is: David Ernest Duke, 11595 Sewanee Drive, Baton Rouge, LA 70816

## ARTICLE XIII

In the event of the death of the founding member a council of succession shall meet to select a successor within 30 days of the death of the founding member.

The council of succession shall consist of the then existing officers of this corporation

The newly selected member shall have all of the powers of the late founding member and shall be referred to as National Director.

The sole founding membership shall be limited to one person and the position shall be identical with and tantamount to being elected National Director.

## ARTICLES XIV

No member of this corporation shall ever be held liable or responsible for contracts, debts or defaults of this corporation in any manner or way whatsoever, nor shall any more informality in organization have the effect of rendering these Articles of Incorporation null or of exposing the members to any liability at all.

THUS DOES David Ernest Duke set his hand and seal to this document in the presence of the undersigned competent witnesses.

| | |
|---|---|
| WITNESSES: | KNIGHTS OF THE KU KLUX KLAN<br>REALM OF LOUISIANA |
| s/ Lucille P. Ducote | |
| s/ Edwin A. Smith, III. | s/ David Ernest Duke<br>DAVID ERNEST DUKE<br>National Director |

State of Louisiana
Parish of Baton Rouge

BE IT KNOWN, That on this 8th day of August, 1975, before me, the undersigned Notary Public, duly commissioned and qualified with the State and Parish aforesaid, and in the presence of the witnesses hereinafter undersigned, personally came and appeared David Ernest Duke, to me well known, who declared and acknowledged that he signed and

executed the foregoing instrument as his act and deed, and for and on behalf of the

KNIGHTS OF THE KU KLUX KLAN, REALM OF LOUISIANA, a corporation, for and

the useses and purposes and on the terms and condition therein set forth.

And the said appearer, being by me first duly sworn, did depose and say that he is the

founding member and party leader of this corporation.

THUS DONE AND SIGNED in the presence of the undersigned competent witnesses.

WITNESSES:

s/ Lucille P. Ducote
s/ Edwin A. Smith, III

KNIGHTS OF THE KU KLUX KLAN
REALM OF LOUISIANA

s/ David Ernest Duke
DAVID ERNEST DUKE
National Director

s/ E. Clark Gaudin
E. CLARK GAUDIN
Notary Public
My Commission Is for Life

Notary Public did not assist in preparation of this document and merely attest to signature.

RULES AND REGULATIONS FOR USE OF
SCHOOL BUILDING FACILITIES

Section I

A. The term "school facilities" as used herein shall include all school buildings, school grounds, or other buildings, property or equipment, or any part thereof, belonging to, in possession of, or operated by this school system.

B. The term "person" as used herein shall mean and include the terms person, group, firm, association, corporation, organization, and all other similar terms.

Section II

Any person who is a resident of East Baton Rouge Parish other than a person who advocates the overthrow of the government of the United States, the State of Louisiana, this school system, or any other unit of government in this nation by the use of force or violence; or who discriminates against any person on the basis of race, color, creed, sex or national origin, shall be permitted to use school facilities for meetings, programs, or other activities which are not prohibited by the laws of the State of Louisiana or the United States of America, except as otherwise provided in Section III hereof.

Section III

A. No person shall be permitted to use school facilities for any meeting, program, or other activity the primary purpose of which is the personal, financial, or pecuniary benefit of such person; however, regularly employed persons of this

school system may be authorized to conduct enrichment programs if approval is first obtained from the Superintendent's office and provided funds derived from these activities are turned into the School Board according to policy.

B. No person shall use such facilities to advocate the deprivation of any constitutional or lawful rights of any person because of that person's race, color, creed, sex, religious or political preference, or to deride or ridicule any other person because of that person's race, color, creed, sex, religious or political preference or belief.

C. No person shall be excluded from use of school facilities because of that person's race, color, creed, sex, or national origin.