CHRISTIAN KNIGHTS OF THE KU
KLUX KLAN INVISIBLE EMPIRE,
INC., et al., Plaintiffs,

v.

The DISTRICT OF COLUMBIA, et
al., Defendants.

Civ. A. No. 90–2615–LFO.

United States District Court,
District of Columbia.

Oct. 29, 1990.
As Corrected Nov. 6 and Nov. 15, 1990.

Arthur Spitzer, American Civil Liberties Union, Washington, D.C., for plaintiffs.

Charles Reischel, Deputy Corp. Counsel, Washington, D.C., for District of Columbia.

John D. Bates, Michael L. Martinez and John C. Cleary, Asst. U.S. Attys., Washington, D.C., for U.S.

## MEMORANDUM [1]

OBERDORFER, District Judge.

On October 23, 1990 plaintiffs Christian Knights of the Ku Klux Klan Invisible Empire, Inc., (the "Ku Klux Klan") and their Imperial Wizard, Virgil Griffin, filed motions for a temporary restraining order and a preliminary injunction enjoining the District of Columbia or, in the alternative, the United States to allow them to march on October 28, 1990 from the Washington Monument to the Capitol to hold a political rally. Defendants United States and the District of Columbia supplied briefs after 12:00 noon on October 25, 1990, a hearing on the matter was held at 4:00 p.m. that same day, and a Memorandum and Order were issued that night, ordering defendant District of Columbia to issue a permit for the entire requested route of plaintiffs' march and denying plaintiffs' motions against defendant United States. *See Christian Knights of the Ku Klux Klan*, 751 F.Supp. 212 (D.D.C.1990). That decision was appealed and, on October 27, the Court of Appeals remanded the case for additional findings of fact and conclusions of law. *See Christian Knights of the Ku Klux Klan*, No. 90–5332 (D.C.Cir. October 27, 1990). On remand, the parties filed proposed findings of fact and a three-and-one-half hour evidentiary hearing was held on the evening of October 27, 1990 and into October 28, 1990. Early on October 28, 1990, an Order was issued. 751 F.Supp. 216. This Memorandum further explains the reasons for the rulings in that Order.

This Court's October 25 Memorandum noted that plaintiffs had applied for a permit from the District of Columbia to walk from their staging area under the Washington Monument to 14th Street and Constitution Avenue, N.W., and down to 3rd Street and Constitution Avenue, N.W., and the District had denied the permit in part, permitting the march to start only from 7th Street and Constitution Avenue, N.W. The Memorandum noted that Deputy Chief Carroll, in charge of security for the march, had detailed all available men, some 2,500 officers, but believed that 1,000 more would be necessary to protect the eleven block route. *See* Memorandum of October 25, 1990. It also noted with favor that United States Government, through the Park Police who are responsible for protecting the Mall area, had found the estimates of Chief Carroll to be "incredible," and represented that the United States would provide any additional resources necessary. *See id.* at 214. The United States also asserted that it would be unable to find 1,000 trained law enforcement personnel, which the Memorandum found "also inherently incredible." *See id.*

Considering the four factors for granting preliminary injunctive relief, the Memorandum found that the plaintiffs had established that they were likely to succeed on the merits because the District's concern for "the violent reaction anticipated from those who disagree with (indeed loathe) plaintiffs and their message" was not likely "proper grounds for imposing a restriction upon speech" because there was ample precedent suggesting that the threat of audience hostility was not a reason for denying a permit altogether. *See id.* 215.

---

1. An earlier version of what was substantially this memorandum was prepared during the morning of Sunday, October 28 and in the absence of the clerk lodged at about 8:15 a.m. at the Courthouse entrance, available to counsel in the event of an appeal. There was no appeal.

That Memorandum also found that the injury from the violation of plaintiffs' First Amendment rights was irreparable and that the public had a paramount interest in the protection of First Amendment rights. *See id.* at 216.

On October 27, 1990, the Court of Appeal vacated and remanded. *See Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. The District of Columbia,* slip op. at 1 (per curiam). In his concurring opinion, Judge Edwards held that no findings were made as to whether "the modification of the requested route was consistent with normal permitting procedures," whether absent the threat of violence plaintiffs "would have been granted the permit sought," and "whether the threat of violence is truly real, substantial and beyond reasonable control." *Id.* at 2, 4, 6 (Edwards, J., concurring). As a consequence, Judge Edwards could not find a showing of irreparable injury. He did not attempt to reconcile the "so-called 'heckler's veto' cases" with the Supreme Court's indication that "concern for public safety is a proper government interest." *See id.* at 3–5.

Judge Randolph, in his separate concurring opinion asserted that the District of Columbia had found that 2,500 law enforcement officers were necessary for protection of the four block area from 7th Street and Constitution Avenue, N.W., to 4th Street and Constitution Avenue, N.W., and he found that "[t]he district court has permitted the Klan to march from 14th Street regardless of whether the additional officers can be rounded up." *See id.* at 1–2 (Randolph, J.). Judge Randolph also observed that reasonable time, place, and manner restrictions were a proper response to the probability of violence, that Deputy Chief Carroll had testified that more than 1,000 additional officers were necessary to secure seven additional blocks, and that the District of Columbia was forced to restrict the plaintiffs' march because there were "no more officers available." *See id.* at 3. Finally, he noted that "[t]he case would be different if there were evidence that the authorities discriminated against the Klan on some improper basis." *See id.* at 4.

Dissenting, Chief Judge Wald found that the trial court had found that the Metropolitan Police had not established that 2,500 police officers were necessary to protect a four-block march and that therefore "there is not sufficient justification for the severe curtailment of the traditional route imposed here." *See id.* at 1–2 (Wald, C.J., dissenting).

These opinions suggest several things. First, if the District of Columbia fails to show a threat of violence "beyond reasonable control," then the plaintiffs are substantially likely to succeed on the merits. Judge Edwards' concurrence suggests that if there were a finding that there was no threat of violence "beyond reasonable control," restrictions based upon the potential violence of a hostile audience would be improper; Chief Judge Wald in dissent held that without a showing that the police could not protect the eleven block route the District of Columbia's restriction of plaintiffs' permit request must be struck down. Second, both Judge Edwards and Judge Randolph indicated that limiting plaintiffs' permit in contravention of the District's practice in similar circumstances would be arbitrary and also invalid. Third, the question of whether, absent clear and present danger, the threat of a hostile audience can ever be proper grounds for limiting the length of a permit is still open: Although Judge Randolph firmly rejected the principle, neither Judge Edwards nor Chief Judge Wald joined him.

While the Court of Appeals did not articulate the appropriate standard for reviewing the District of Columbia's assertion that there was a threat of violence "beyond reasonable control," Judges Edwards and Randolph did suggest that some "hesitancy" to intervene is appropriate. *See id.* at 5 (Edwards, J., concurring) (citing *Belknap v. Leary,* 427 F.2d 496 (2d Cir.1970) (holding that there is strong presumption that police responsibly perform their duties)); *see id.* at 4 (Randolph, J., concurring) (same). This hesitancy is based upon the reality that the police are far more expert on questions of crowd control and the risks of violence than the judiciary. In this case, however, there is an additional complica-

tion. The assertions of the Metropolitan Police Department are controverted by their federal colleagues, the Park Police, who are involved in the same operation. The Park Police have the same interest as the Metropolitan Police Department in protecting the Capitol City and in reducing violence and potential risk to the public and their officers, and they also have a interest in maintaining good relations with the Metropolitan Police with whom they cooperate frequently. Declaration of Carl J. Holmberg at ¶ 9. The Court is therefore faced with direction by the Court of Appeals to defer to the police and · two police forces making conflicting assertions. Accordingly, the Metropolitan Police Department deserves considerable deference in their factual determinations but, in equal deference to the Park Police, the differences between them must be resolved based upon the normal judicial criteria of demeanor, credibility, and consistency.

## Findings of Fact

Upon careful consideration of the order and opinions of the Court of Appeals, the parties' filings in this matter, the two hour hearing held on October 25, and the more than three hour post-remand hearing on October 27, and in further explanation of the Order issued on October 28, 1990, I find that:

1. The route along Constitution Avenue for demonstrations assembling at the Monument and demonstrating at the Capitol is a traditional segment of the nation's premiere public forum.

2. The National Park Service and the Park Police have jurisdiction over the entire mall area, including an area under the Washington Monument at the corner of 14th Street and Constitution Avenue, N.W., often used as a staging point for marches to the capitol. The District of Columbia Metropolitan Police Department has jurisdiction over Constitution Avenue, N.W., east of 14th Street to 3rd Street, N.W. The United States Capitol Police has jurisdiction over the Capitol grounds which begin at 3rd Street and Constitution Avenue.

3. The District issued a permit to the plaintiffs to march along the traditional route from the Monument to the Capitol via Constitution Avenue on September 2, 1990. On that date, when a hostile group illegally blocked the intersection of 14th Street and Constitution Avenue, Metropolitan Police Officers on the scene called for transport to arrest them. That request, however, was countermanded. Instead, plaintiffs were compelled to abandon their planned march and taken by a circuitous route, out of public view, to their destination at the Capitol. Major Holmberg of the Park Police who was near the Washington Monument at the time testified that it was fully within the capability of the officers on the scene to effect arrest and clear the street to safely permit plaintiffs to march to the Capitol. An affidavit and testimony to the contrary by Inspector Collins of the Metropolitan Police Department, who was not present at the scene, was not as convincing as Holmberg's testimony. The District was not justified by the threat of violence in diverting plaintiffs on September 2.

4. On September 17, plaintiffs applied for a second permit to march. After several discussions with defendants, the October 28 date was agreed upon. At that meeting, the Park Police issued permits for plaintiffs to organize at the Washington Monument, and the Capitol Police issued a permit for plaintiffs to demonstrate at the Capitol. On October 19, the District granted plaintiffs a permit to march from Seventh Street to Third Street on Constitution Avenue but denied them a permit to march on Constitution from the organization point at the Monument and 14th Street to 7th Street. An alternative route from the Monument down Madison Drive was also suggested, but the Park Police never acted on plaintiffs' alternative application.

5. The requirement for police protection in the dimensions called for here is a direct function of the majority's abhorrence of plaintiffs and their message and the violence threatened by hostile groups to prevent plaintiffs' demonstration. The District would not have limited the permit but for this threat of violence. *See* Affidavit of Thomas Carroll, Deputy Chief of the Met-

ropolitan Police Department, at 3, ¶ 4; Letter of Isaac Fulwood, Jr., October 22, 1990, attached to Complaint.

6. The threat of violence is "truly real and . . . substantial."

7. The Metropolitan Police Department plans to have over 1,500 officers standing shoulder to shoulder on Constitution Avenue from 7th Street to 4th Street and more than 600 officers available as a rapid response group. The Park Police will deploy over 300 officers, and the Capitol Police will provide an additional 600 officers. The Metropolitan Police Department by affidavit and testimony asserts that, even with the support of the Park Police and the representation by the United States Government that it will provide whatever reasonable support is necessary to maintain control during the march, the Metropolitan Police cannot maintain reasonable control on the full route with the officers available. Park Police officials by affidavit and testimony subject to cross-examination are of the opposite opinion. They assert that this number of officers is sufficient reasonably to control any threat of violence. The United States vigorously advocates use of the full Constitution Avenue route. Consideration of intelligence information about potential violence which the Metropolitan Police Department received the evening of October 27 and presented under seal at the hearings on that date, as well as current political events, did not alter Park Police opinions as to the number of police officers needed to ensure control. Furthermore, Deputy Chief Carroll of the Metropolitan Police Department testified that the information contained under seal would not lead him to seek to cancel the permit for a march from 7th Street to the Capitol, to increase the number of officers scheduled to be available for the march from 7th Street to 3rd Street, or to otherwise materially change his plans or assessment of risk. Plaintiffs provided affidavit and testimony by Robert Klotz, an independent consultant and a nationally recognized expert in crowd control and a former Deputy Chief of the District of Columbia Metropolitan Police Department who helped manage or was responsible for police pro-

tection during demonstrations and marches from 1971 to 1980. Mr. Klotz stated that, in his opinion, the current police force is more than adequate to handle this demonstration and that the Police Department's position is "bewildering." Affidavit of Robert Klotz at 5, ¶ 11. The testimony of the Park Police, buttressed by the expert testimony of Klotz, was convincing. In addition, the testimony of Inspector Collins contained inconsistencies and was not as persuasive. As a result, I find that the threat of violence is not beyond reasonable control.

8. Though from time to time the District has issued permits for marches for less than the full extent of Constitution Avenue from 14th Street to 3rd Street, there is no evidence that any group who requested the longer route has ever been denied access to that route. Former Deputy Chief Klotz testified that to his knowledge the Police had never limited a route due to the number of demonstrators nor due to threats of violence. Though the police have altered routes when a counterdemonstration was expected to create a buffer zone, they have never halved a route due to a counterdemonstration. The District of Columbia, though it presented some evidence as to permits formerly granted and as to a Hispanic festival that was limited (by Park Police, not by the Metropolitan Police) from use of the area from 14th Street to 17th Street, did not present any evidence materially contradicting Klotz's testimony. There is no showing that any march has ever been attenuated due to a threat of mob violence and a conclusion by the District that the threat was beyond reasonable control.

### Conclusions of Law

1. A motion for preliminary injunctive relief should be considered on the basis of (1) the likelihood of plaintiffs' success on the merits, (2) the threat of irreparable injury to plaintiffs in the absence of an injunction, (3) the possibility of substantial harm to other interested parties from a grant of injunctive relief, and (4) the interests of the general public. *See, e.g., Wag-*

*ner v. Taylor,* 836 F.2d 566, 575 (D.C.Cir. 1987).

■ 2. Plaintiffs have demonstrated a substantial likelihood that they will prevail on the merits on the theory that the District effectively denied them the forum necessary to communicate their "point." Plaintiffs had a permit to march from the Washington Monument to the Capitol along Constitution Avenue on September 2. They were unable to do so: Instead, in order to avoid violence threatened by protestors hostile to plaintiffs' message, the District of Columbia diverted them from their route. Now, plaintiffs have a new message—they cannot be denied full access to a public forum merely because their ideas are opposed by those who would resort to violence. If they cannot walk the entire route previously denied to them, this message cannot be communicated. *Cf. Dr. Martin Luther King, Jr., Movement, Inc. v. City of Chicago,* 419 F.Supp. 667, 674–75 (N.D.Ill.1976) (holding that in that case the alternate route suggested by authorities "had the effect of depriving plaintiffs of their First Amendment rights").

■ 3. Plaintiffs have also shown a substantial likelihood that they will prevail on the merits on the theory that the District of Columbia's restriction upon their permit was an improper time, place, and manner restriction. Time, place, and manner restrictions must be content-neutral, narrowly tailored to serve a compelling government interest, and leave open ample alternative avenues of speech. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). The District of Columbia restricted the location of plaintiffs' march based upon a real and substantial threat of a hostile audience, but there was and is no showing of a credible threat that the violence will be beyond reasonable control. Because there is a strong constitutional antipathy to the so-called heckler's veto, *see, e.g., Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365–66, 22 L.Ed.2d 572 (1969); *see also NAACP Legal Defense & Education Fund, Inc. v. Devine,* 727 F.2d 1247, 1261–62 (D.C.Cir.1984) *rev'd on other grounds sub nom. Cornelius v. NAACP Legal Defense & Education,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) and because of the apparent law of this circuit, *see supra* 220, the District of Columbia's failure to make that showing indicates that its restriction was not based upon a compelling government interest.

4. Plaintiffs have shown a substantial likelihood that they will prevail on the merits on the theory that their First Amendment rights were abridged in violation of the Fourteenth Amendment. Traditionally the District has not significantly restricted a political demonstration based upon the threat of a hostile audience. "[S]elective exclusions from a public forum must be carefully scrutinized" and "tailored to serve a substantial governmental interest." *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (citations omitted); *see supra* at 220. Because there is no threat of violence "beyond reasonable control," the threat of violence in this case is not materially distinguishable from other cases, including the September 2, 1990 march, in which permits were granted despite a substantial possibility of violence. As a consequence, the District's administrative decision to restrict plaintiffs' permit is not based upon any discernible standard and deprives plaintiffs of equal protection of the laws.

5. Plaintiffs have also shown a substantial likelihood that they will prevail on the theory that the District of Columbia acted upon permissible grounds. The District of Columbia restricted plaintiffs' permit because of the threat of violence from a hostile audience. There is a strong constitutional principle against the "heckler's veto." *See supra* 223. Several cases suggest that audience hostility is an impermissible ground even for a time, place, and manner limitation. *See Collin v. Chicago*

**224**

*Park Dist.,* 460 F.2d 746, 754 (7th Cir. 1972); *Dr. Martin Luther King, Jr., Movement v. City of Chicago,* 419 F.Supp. 667, 675 (N.D.Ill.1976). The District of Columbia has not cited any cases demonstrating that the threat of audience hostility is a valid ground for a time, place, manner restriction. The weight of precedent, along with the more equivocal suggestion of the Court of Appeals, *see supra* at 220, is therefore in plaintiffs' favor.

■ 6. The plaintiffs will suffer irreparable injury if preliminary relief is not granted. In general, violations of a First Amendment right are irreparable because such an injury cannot be fully compensated by later damages. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *White House Vigil for the ERA Comm. v. Watt,* 717 F.2d 568 (D.C.Cir.1983); *A Quaker Action Group v. Hickel,* 421 F.2d 1111, 1116 (D.C.Cir.1969); *Waters v. Barry,* 711 F.Supp. 1121, 1123 (D.D.C.1989); *Community for Creative Non–Violence v. Carvino,* 648 F.Supp. 476, 479 (D.D.C.), *rev'd on other grounds sub nom. Community for Creative Nonviolence v. Kerrigan,* 865 F.2d 382 (D.C.Cir.1989). For reasons stated in Conclusions of Law ¶ 2, plaintiffs will be deprived of a substantial portion of the message they seek to convey if their march is limited and forced to begin at 7th Street. Furthermore, plaintiffs assert that if they are restricted in their marching in the District of Columbia, other communities across the country will attempt to prevent plaintiffs from holding their street walks. *See* Declaration of Virgil L. Griffin ¶ 5. If other communities learn that their walks may be restricted, there are strong indications those communities will do so. *See id.* ¶ 20. Furthermore, the full route from the Washington Monument to the Capitol is the premier public forum in the nation. If the plaintiffs are denied that forum due to controllable audience hostility, they will have been denied the ability to exercise a right to speak and assemble not denied to other citizens because their message is so abhorred by many who would counter it with violence.

7. It is likely that there will be substantial injury to members of the Metropolitan Police Department and the Park Police.

■ 8. The public's interest is in favor of granting the motion. The public will be inconvenienced by closing of the Mall and blocking of traffic. Some even may be injured as the police attempt to keep control over violent and disorderly counterdemonstrators. The overriding public interest is, however, in vindicating free speech. *See, e.g., Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 578 F.2d 1122, 1127 (5th Cir.1971), *vacated on other grounds,* 454 U.S. 1075, 102 S.Ct. 626, 70 L.Ed.2d 609 (1981). That interest is especially compelling here. The route to be walked by the plaintiffs is the premier public forum in this country, and the public has an interest in establishing that eleven blocks of Constitution Avenue can be protected at all times by the combined resources of the District of Columbia and the United States and that no mob can rule seven blocks of Constitution Avenue.

### Conclusion

It may be that in some other places and at some other time or on some other occasion it would be reasonable to attenuate access to the full length of a traditional protest or parade route because the police protection deemed to be required was not available to contain a mob threat. It may be also that the threatened violence would be beyond the control of the District if it depended solely on its own resources. But this is the Nation's Capitol. The United States supports plaintiffs' claim that they have a constitutional right to march the full route. The United States represented in open court that it would furnish the District all of the personnel and other resources reasonably required to protect the plaintiffs on their march, to protect government property along the route, and to maintain order in this "Seat of Government." United States Constitution, Art. I, Sect. 8. The public's interest is clearly in maintaining the inviolability of the forum

that the plaintiffs seek to use today. In addition, denial of plaintiffs' application for a permit to march from 14th Street to 7th Street on Constitution Avenue denies them an opportunity to "make their point," that denial is without substantial justification, and it contradicts the District of Columbia's normal practice. Therefore, plaintiffs are likely to prevail on the merits. They have also demonstrated that denial of the permit required for expression of their message would cause them irreparable injury. In light of this showing, the potential for violence is one of the costs a functioning democracy must bear.