**BOY SCOUTS OF AMERICA and South Florida Council, Boy Scouts of America, Plaintiffs,**

**v.**

**Frank L. TILL, Jr., individually and in his capacity as Superintendent of the Broward County Public Schools, and Darla L. Carter, individually and in her capacity as Chairperson of the School Board of Broward County, and Carole L. Andrews, Judie S. Budnick, Paul D. Eichner, Stephanie Arma Kraft, Miriam M. Oliphant, Robert D. Parks, Diana Wasserman–Rubin, and Lois Wexler, individually and in their capacities as members of the School Board of Broward County, Florida, Defendants.**

No. 00–7776–CIV.

United States District Court, S.D. Florida.

March 21, 2001.

Sharon L. Kegerreis, Beatriz Cristina Galbe, Hughes Hubbard & Reed LLP, Miami, George Davidson, Carla Kerr, Hughes Hubbard & Reed LLP, New York City, for Plaintiffs.

Edward J. Marko, School Board Attorney, Marylin Batista, Assistant School Board Attorney, School Board of Broward County, Bruce Rogow, Reverly Pohl, Bruce S. Rogow, P.A., Fort Lauderdale, Michael Burke—Attorney for Defendant Carole L. Andrews Johnson, Anselmo, Murdoch, Burke & George, P.A., for Defendants.

## *ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon Plaintiffs' Complaint and Motion for Preliminary Injunction filed on December 4, 2000.

## I. INTRODUCTION

This case is another chapter in the struggle between private speech and public tolerance. The Broward County School Board permits numerous organizations, including churches, private membership organizations, athletic clubs and other outside groups, to utilize its school facilities for after-hour use. The School Board concedes that this longstanding practice amounts to the creation of a "limited public forum" for purposes of First Amendment analysis. However, the School Board also employs an "anti-discrimination" policy, known as Policy 1341, that prohibits the "rental use or enjoyment of school facilities by any group or organization which discriminates on the basis of age, race, color, disability, gender, marital status, national origin, religion, or *sexual orientation.*" For many years, the local arm of the Boy Scouts of America, the South Florida Council, Inc., Boy Scouts of America, has enjoyed the after-hours use of many Broward school facilities. Moreover, in 1998, the two sides entered into a five-year partnership agreement that authorized a "School Night for Scouting" throughout the Broward School District at school facilities and allowed school administrators to assist the Scouts in promoting the event during school hours through activities such as school announcements and the distribution of promotional materials. However, prompted by the Boys Scouts' policy of excluding homosexual children and adults from group membership and the recent United States Supreme Court decision in *Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), the School Board has decided to terminate the partnership agreement with the Scouts. Further, the School Board has concluded that the Scouts are ineligible to rent and lease school facilities like any other private group because the Scouts' membership policies discriminate on the basis of sexual orientation, and therefore violate the School Board's anti-discrimination policy. The Scouts assert that this decision is impermissible viewpoint discrimination under the First Amendment as well as violative of the Equal Protection Clause of the Fourteenth Amendment. The Scouts now bring this lawsuit seeking a preliminary injunction that would prevent the School Board from denying them the after-hours use of school facilities based on their membership policies regarding homosexuals.

I find this a difficult case for many reasons. At issue are the efforts of public educators, parents, and the members of a private expressive association to prepare young people for participation as citizens and to teach the values upon which our

society rests. Despite a history of working together, and despite many shared goals, the Boy Scouts and the School Board have reached an impasse over a divisive question, whether homosexuality is a matter of private sexual orientation that should be protected against discrimination or whether it is immoral conduct inconsistent with the values of being "morally straight" and "clean." Such questions might be better left to parents, teachers, and moral and religious leaders. As did Learned Hand, I often wonder whether we do not rest our hopes too much upon constitutions, upon laws, and upon courts. With so much common ground, there should be a way for the Boy Scouts and the School Board to find an accommodation. For as Judge Hand also eloquently stated: "[T]he spirit of liberty is the spirit which is not too sure that it is right; the spirit of liberty is the spirit which seeks to understand the minds of other men and women." Address at the "I am an American Day" Ceremony held in Central Park, New York City (May 21, 1944), *in The Spirit of Liberty* (1952). Nevertheless, this case involves competing principles of constitutional stature which I am obligated to address.

The parties have submitted memoranda of law, proposed findings of fact and conclusions of law, and presented evidence and argument at the March 13, 2001 hearing. Upon review of the parties' arguments and the relevant portions of the record, the Court grants Plaintiffs' Motion for a Preliminary Injunction. For the reasons outlined below, Defendants are enjoined from preventing Plaintiffs from using Broward County public school facilities and buses during the off school hours by reason of the Boy Scouts' membership policy.

## II. FINDINGS OF FACT

The Boy Scouts of America is a private, non-profit, national organization founded in 1910 and headquartered in Irving, Texas. The group's mission is to instill the values of the Scout Oath and Law in its youth members.[1] The Scout Oath and Law are reprinted below:

### Scout Oath

On my honor I will do my best
To do my duty to God and my country and to obey the Scout Law;
To help other people at all times;
To keep myself physically strong, mentally awake, and morally straight.

### Scout Law

A Scout is . . .

| | |
|---|---|
| Trustworthy | Obedient |
| Loyal | Cheerful |
| Helpful | Thrifty |
| Friendly | Brave |
| Courteous | Clean |
| Kind | Reverent |

While a large national organization, The Boy Scouts of America is comprised of numerous local charters. The Local Charter run by the South Florida Council[2]

1. The Mission Statement of Boy Scouts of America states:
 The mission of Boy Scouts of America is to prepare young people to make ethical choices over their lifetimes by instilling in them the values of the Scout Oath and Law.

2. The South Florida Council, Inc., Boy Scouts of America, is a Florida corporation formed to "promote, within the territory covered by the charter from time to time granted it by the Boy Scouts of America and in accordance with the Congressional Charter, Bylaws, and Rules and Regulations of the Boy Scouts of America, the Scouting program of promoting the ability of boys and young men and women to do things for themselves and others, training them in Scout craft, and teaching them patriotism, courage, self reliance, and kindred virtues, using the methods which are now in common use by the Boy Scouts of America." Bylaws, South Florida Council, Article II, Section 1. The Council was issued a local

encompasses three South Florida counties: Miami–Dade, Broward, and Monroe. The South Florida Council serves approximately 25,000 children; 9,298 of whom reside in Broward County. In Broward County, those Scout groups are supported by 3,168 volunteer leaders.

The Boy Scouts of America's national policy regarding homosexuals is set forth in the National Council Boy Scouts of America Position Statements—Module 3: Homosexuality:

> The Boy Scouts of America has emphasized traditional family values since the inception of the movement. We believe avowed homosexuals do not provide a role model for Scouts that is consistent with the values of the Scout oath and Law. Accordingly, the Boy Scouts of America does not accept avowed homosexuals as members or leader[s].

A June 28, 2000 statement issued by Roy L. Williams, the Chief Scout Executive of the Boy Scouts of America, announcing the Supreme Court of the United States's decision in *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), explained the organization's position: "We believe an avowed homosexual is not a role model for the values espoused in the Scout oath and Law." At the hearing on the motion for preliminary injunction, Jeff Hermann, Scout Executive for the South Florida Council, acknowledged that while in his twenty years of scouting no boy had been excluded for such a reason, the South Florida Council of the Boy Scouts of America complies with the national policy of the Boy Scouts of America regarding exclusion of homosexuals as members or leaders.

The School Board of Broward County, Florida, operates the fifth largest public school district in the United States and the second largest fully-accredited public school district in the United States. The School District is comprised of 203 schools and centers. 249,932 students attend those schools. There are 128 elementary schools, 35 middle schools, 24 high schools, 6 vocational/adult schools and 10 centers. The elementary school enrollment is 121,-730; the middle school enrollment is 59,-037; the high school enrollment is 64,079, and the center enrollment is 5,077. According to a longstanding practice, the School Board has permitted numerous organizations, including churches, private membership organizations, athletic clubs and other outside groups, to use the public schools and school buses through written partnership agreements, lease agreements with individual schools, transportation agreements, and informal oral understandings. The Boy Scouts and the Girl Scouts have conducted meetings in public school facilities in Broward County for many years.

On September 15, 1998, the School Board approved a five year "Partnership Agreement and use of School Bus Transportation Agreement" with the South Florida Council of the Boy Scouts of America. The stated purpose of the Partnership Agreement was as follows:

> The purpose of this partnership is to enhance the involvement of this group in schools. Through their learning resources the Boy Scouts will provide programs that will complement and enhance multi-education and environmental education curriculum already in place. They will also work with career edu-

---

charter "for furtherance and supervision of the Scouting program for boys and young adults within the territory designated in accordance with the application for charter for

the year ending June 30, 2001." Charter issued by The National Council of the Boy Scouts of America.

cation programs to provide students with career mentors and work-based learning experiences. Additionally, the transportation agreement allows the Boy Scouts to utilize District school buses for their sponsored activities at the published non-profit rate.

Article IV of the Partnership Agreement provides:

Neither party shall discriminate against any employee or participant in this program because of age, race, color, disability, gender, marital status, national origin, religion *or sexual orientation,* or other considerations arising from the Americans with Disabilities Act. (emphasis supplied).

Article VIII of the Partnership Agreement provides that the agreement "may be terminated by either party upon thirty (30) days written notice to the other party with or without cause." The Partnership Agreement was executed by Jeff Hunt, a South Florida Council Field Director authorized to enter into the Agreement. The signed Agreement and the transmittal letter returning the Agreement to the School Board were provided to Jeff Hermann, the South Florida Council Executive.

Pursuant to this Agreement, the South Florida Council has utilized 57 School District elementary schools and four middle schools in Broward County for Scout meetings.[3] Some of the schools are used by multiple Boy Scout troops or Cub Scout

packs. For example, Embassy Creek Elementary and Pembroke Pines Elementary host six troops apiece while Hawkes Bluff hosts eight troops. The Scout meetings generally occurred weekly, and the Cub Scout packs met monthly, with weekly den meetings. At School District facilities, 1,985 scouts and 625 adult leaders participated in scouting events.

The Agreement also enabled the South Florida Council of the Boy Scouts of America to recruit members from the students in the Broward County School District schools through a joint Boy Scout and School District effort. That recruitment effort was a major source of Scout membership. An evening was designated as "School Night for Scouting," during when selected schools throughout the District were opened for the purpose of enrolling families into the Scouting Program. In advance of School Night for Scouting, Scouting wall posters were placed within schools, flyers were distributed, and scouting volunteer leader representatives were permitted to make a presentation to students during school hours and to distribute promotional material about scouting. School administrators assisted Scout representatives in coordinating the logistics of School Night for Scouting, and in distributing Boy Scout promotional materials. Those materials were distributed through assemblies or in classroom presentations,

---

3. Among them are Coconut Creek Elementary; Westchester Elementary; Park Springs Elementary; Winston Park Elementary; Sheridan Hills Elementary; A.C. Perry Elementary; Nova Eisenhower Elementary; Nob Hill Elementary; Riverside Elementary; Ramblewood Elementary; Hawkes Bluff Elementary; Pembroke Lakes Elementary; Sunshine Elementary; Plantation Park Elementary; Martin Luther King Elementary; Central Park Elementary; Village Elementary; Stephen Foster Elementary; Indian Trace Elementary; Griffin Elementary; Horizon Elementary; Eagle Point Elementary; Watkins Elementary; Cooper City Elementary; Davie Elementary; Driftwood Elementary; Embassy Creek Elementary; Miramar Elementary; Oakridge Elementary; Palm Cove Elementary; Pembroke Pines Elementary; Sheridan Park Elementary; Silver Lakes Elementary; Silver Palms Elementary; Stirling Elementary; West Hollywood Elementary; Harbordale Elementary. The four middle schools are Silver Trail, Indian Ridge, Seminole, and Young middle schools.

to boys in the first through sixth grades. In July 2000, the Superintendent advised elementary, middle, and center school principals of the September 14, 2000 School Night for Scouting, and asked principals to announce the School Night for Scouting through morning announcements or in the school bulletin, and asked the principals to ask a school representative to attend School Night for Scouting. Similar memoranda from the Superintendent were distributed in 1998 and 1999 to encourage school involvement with Scouting. The Boy Scouts and the Girl Scouts have conducted meetings in public facilities in Broward county for many years (Hermann Aff. ¶ 2.) School buildings have been used in the past for Boy Scout Troop and Cub Scout Pack meetings at night from 7:00 p.m. to 9:00 p.m., for Cub Scout Den meetings late in the afternoon after school or early in the evening (Hermann Dep. at 48) and once a year in the fall for an evening recruitment meeting. (Meyers–Kershaw Dep. at 5–7; Hermann Dep. at 41) Although the South Florida Council's major source of recruitment was at the public schools in Broward County, the vast majority of Boy Scout troops and Cub Scout packs in Broward County meet at locations other than Broward public school buildings. In excess of 85% of all Scout members currently meet at locations other than Broward School District facilities.[4]

On September 18, 2000, an advisory panel to the Superintendent known as the Diversity Committee met to discuss the Boy Scouts' use of the public schools. The meeting had been prompted by the decision of the United States Supreme Court

in *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), a copy of which was circulated to each member of the Committee prior to the meeting. The Diversity Committee recommended to the Superintendent that the School Board take action to prevent Boy Scout Troops and Cub Scout Packs from using the Broward County public schools. No recommendation was made to terminate the rights of any other outside group using the Broward County Public Schools.

On September 20, 2000, Superintendent of Schools Frank Till wrote to Jeff Herman, the South Florida Council Executive, reminding him of the District's non-discrimination policy and the Partnership Agreement:

> The School Board has a Partnership Agreement with the SFCBSA that specifically provides that the SFCBSA cannot discriminate on the basis of sexual orientation against any participant in the program provided under the Agreement.
>
> \* \* \* \* \* \*
>
> Please advise whether the South Florida Council will follow [the homosexual] policy expressed by the Boy Scouts of America.

Mr. Herman responded on September 27, 2000, saying that "the non-discrimination statement in the Partnership Agreement was clearly not intended to dictate Scouting's membership policies to it...." Mr. Herman stated the South Florida Council's adherence to National Boy Scout policy regarding homosexuals, and concluded his letter with this admonition:

---

4. In addition to the use of School District facilities and the assistance of School District personnel in Boy Scout recruitment, there were "Annual Charter Agreements" between 26 School District Elementary schools and the South Florida Council. These "Charter Agreements" bound the "chartered organiza-

tions ... to ... [c]onduct the Scouting program according to its own policies and guidelines as well as those of the Boy Scouts of America." The "council agreed to .. [r]espect the aims and objectives of the [chartered] organization and offer the resources of Scouting to help in meeting those objectives."

"Any attempt to treat Boy Scouts on an inferior basis from other organizations which rely on use of school facilities would require us to seek legal redress. Singling out Boy Scouts for exclusion would be unconstitutional viewpoint discrimination in violation of the First Amendment...."

On November 14, 2000, members of the School Board unanimously voted to authorize the Superintendent to send a 30–day notice informing Boy Scouts that their Partnership Agreement and Transportation Agreement with the School Board would be terminated and that the Boy Scouts would no longer be able to use any public school facility after that 30–day period. No action was taken by the School Board regarding any other outside group using Broward County school facilities. (Hermann Aff. ¶ 25; Defs. Prop. Findings ¶ 13.)

Prior to voting to exclude Boy Scouts from meeting in schools, individual members made clear that the Board sought to send its own expressive message to the community.

> We have an obligation to set an example and we can't very well preach one thing and do something else.... No one group has the right to say that their opinion is better to the exclusion of someone else's group or someone else's opinion.

> . . . . .

(Ortega Aff. Ex. 25 at 20 (P. Eichner.))

> [We should have] zero tolerance with this policy. By no means are we going to accept that and we're not going to have a dual policy here.... And who are you to say that this person because of ... my preference that I would not accept him. That is not acceptable.... Let's not just talk the talk. Let's walk the walk. Walk this process through so that the message gets out into this com-

munity.....[I]t is a priority of this Board to get this message out there ...

> ... I don't tolerate discrimination. And I want people to understand it would not be tolerated ... You have to take a position.

(Ortega Aff. Ex. 25 at 13–15 (M.Oliphant.)) One member described the Board members as role models standing against the Boy Scouts' view:

> [B]eyond a strong statement of nondiscrimination which this Board has taken and has continued to take, we adopted a series of character traits and we as leaders have to set a role model and two of these character traits ... are respect and tolerance, and if we don't ensure that we're role modeling respect and tolerance we can't expect our children, our students, to learn and embrace those same traits.

(Ortega Aff. Ex. 25 at 19 (S.Kraft.))

The precipitating factor for the Board's action appeared to be the Supreme Court's decision in the *Dale* case and surrounding publicity.

> The Scouts wanted to make a statement and that they did by pushing this point to the Supreme Court. By so doing, they put us on notice of something that we were unaware of previously. Had it not gone to court, had it not gotten the publicity that it did, we may never have known about it and may not be having this discussion ... If we have no knowledge that there was a breach of contract, we can't take action.

(Ortega Aff. Ex. 25 at 20.)(P. Eichner).

> [T]hey are not like all others at that point, because they have come forward and made a statement that they have a discriminatory policy and we now know about it. These other entities that we will be reviewing over the next 30, 60,

90, 120 days we have no direct knowledge of.

(Ortega Aff. Ex. 25 at 24.)

The Board also understood that its decision would deny the Boy Scouts any right to use or lease school facilities for meetings on any basis. (Ortega Aff. Ex. 25 at 23 (P. Eichner.)); (Ortega Aff. Ex. 25 at 27 (S.Kraft.))

On November 17, 2000, Superintendent Till wrote to the South Florida Council Executive and provided the Council with a 30–day notice of termination of the Partnership and Transportation Agreement. That 30–day period has been extended to March 30, 2001. *See supra* at 2.

The School Board also has "Partnership Agreements" with the Girl Scouts and other organizations, which provide a variety of benefits and services to the school system and its students. These organizations include, for example, Broward Community College, Nova Southeastern University, the United Way of Broward County, Broward Urban River Trails, the Graves Museum of Archaeology and Natural History, the Florida Department of Children and Family Services, the Museum of Art of Fort Lauderdale, the Miami Heat, the Daily Bread Food Bank, the Broward Council of PTA's, Broward County Grandparents, the Broward County Library System, and the Broward County Bar Association. In addition to those operating under the Partnership Agreements, there are approximately 120 organizations using School District facilities for after-hours meetings pursuant to lease agreements.

However, the School Board also has implemented an "anti-discrimination" policy, School Board Policy 1341, that regulates the "Use of Broward County School Facilities for Non–School Purposes." The policy permits after-hours use of School Board facilities by any organization that complies with the "Lease Provisions" promulgated by the School Board and complies with the School Board Policy 1341 requirement that "the rental use or enjoyment of school facilities or services by any group or organization which discriminates on the basis of age, race, color, disability, gender, marital status, national origin, religion or sexual orientation will not be permitted." [5]

Groups using the schools include a number of sororities, pom pom teams and cheerleading teams, which use the schools despite the fact that their participants are all girls. Numerous youth groups which regularly meet in the Broward County public schools limit participation to students of certain ages, such as the National Child Labor Committee, the Florida Youth Orchestra, and the Biddy Basketball League. Groups consisting of senior citizens also use the schools, including the National Council on the Aging and the Service Agency for Senior Citizens of Broward County. Both senior citizen groups have partnership agreements with the School Board.

Some groups using the Broward County public schools focus their efforts on persons of certain ethnicities. For example, the Urban League of Broward County, Inc. conducts programs for African–American children while Inroads, a group that selects high school students from certain minority groups for its programs, gives preference to African–American, Hispanic, and Native American students. Both In-

---

**5.** In addition, School Board Policy 1343(5) provides that "[a]ll non-school allied groups must show a letter certifying their eligibility to rent, use or enjoy a school facility or service unless they have a partnership agreement with the Board.... The mechanism for certifying agencies shall be part of the functions of the Equal Educational Opportunities Department."

roads and the Urban League have partnership agreements with the School Board. In addition, Zeta Phi Beta, an African–American sorority, signed a lease for the use of the schools which includes a nondiscrimination clause, yet the group limits its membership to African–American women and its programs are for girls, i.e. charm classes and an annual debutantes cotillion. Further, the School Board has allowed numerous churches and other religious groups to use the Broward County public schools facilities for meetings, worship services, and other activities, including the baptism of believers in school pools. Congregations using the schools include churches and synagogues of several denominations, including Baptist, Seventh Day Adventist, Catholic, and Jewish.

On November 14, 2000, the School Board voted unanimously to terminate the Partnership Agreement between the Board and the South Florida Council of the Boy Scouts. The School Board chose to terminate this Agreement, which authorized Scout use of School Board facilities and school buses, because of the Boy Scout policy of excluding homosexuals. The Boy Scouts are the only group whose rights to use the Broward County Public Schools have been terminated based upon the application of School Board Policy 1341 or any other nondiscrimination policy. The termination was to be effective on December 17, 2000.

On December 4, 2000, the Boy Scouts of America and the South Florida Council of the Boy Scouts of America sued the Superintendent of the Broward County Public Schools and the Chairperson and Members of the School Board of Broward County in their individual and official capacities based on the School Board's termination of the Partnership Agreement. The Plaintiffs sought "to enjoin Defendants from discriminating against them by denying Boy Scouts access to Broward public school facilities on the basis of Boy Scouts' viewpoints." (Complaint, ¶ 1). The Boy Scouts, claiming a First Amendment right of "Freedom of Speech and Expressive Association" (Count I) and a "violation of Equal Protection" (Count II), sought injunctive relief.

This Court set a hearing for December 14, 2000. On December 12, 2000, the School Board voted to extend the termination date until March 30, 2001, and the Defendants moved to cancel the December 14, 2000 hearing, agreeing that "[n]o Boy Scout meetings or transportation uses will be precluded before that time," and suggesting that "[t]he issues posed by the Boy Scouts Complaint are better resolved on a non-emergency basis, allowing a proper record to be made." (Defendants' Motion to Cancel Hearing Set for December 14, 2000 at 5:00 p.m. at 3) (DE# 29). The Court granted the Motion and rescheduled the hearing on preliminary injunction for March 13, 2001.

In their Motion for a Preliminary Injunction, Plaintiffs assert that the School Board has created a limited public forum. Plaintiffs also argue that Defendants have engaged in viewpoint discrimination. (Mot. Prelim. Inj. at 10.) Specifically, Plaintiffs claim that "the very efforts of the Boy Scouts in protecting their constitutional rights from government infringement in *Dale* caused the [School Board] here to initiate government action against them." (*Id.*) Additionally, Plaintiffs contend that Defendants' actions violate the Equal Protection Clause. (*Id.* at 18.) According to Plaintiffs, Defendants have singled out the Boy Scouts in applying a nondiscrimination policy that would preclude any organization focusing its efforts on one age group or sex from using the schools, if applied equally to all the organi-

zations that currently use the public schools' facilities. (*Id.*)

Defendants concede that the School Board of Broward County has created a limited public forum by permitting a broad range of organizations and groups to utilize the School District's facilities for after-hours school use. Defendants also do not contest the claim that Boys Scouts have a First Amendment right to freedom of expressive association, including the right to exclude homosexuals as members or leaders in the organization. Defendants recognize that the Boy Scouts have asserted a right to exclude homosexuals for over twenty (20) years. However, in response to Plaintiffs' Motion, Defendants argue that the School Board of Broward County has a compelling governmental interest in enforcing its anti-discrimination policy.

Defendants assert that the unique relationship between the School District and the Boy Scouts justifies the enforcement of such policy. Defendants also contest Plaintiffs' claim that Defendants have violated the Equal Protection Clause. According to Defendants, there is no evidence of discrimination by other users of School District facilities. Finally, Defendants claim that the South Florida Council, Boy Scouts of America, waived its right to freedom of expressive association in its relationship with the School Board of Broward County when it entered into the "Partnership Agreement Between the School Board of Broward County and the South Florida Council of Boy Scouts of America."

At the hearing held on March 13, 2001, Plaintiffs conceded that Defendants have exercised their right to terminate the Partnership Agreement between the School Board of Broward County and the South Florida Council.[6] Plaintiffs now contend that all they are requesting is "meeting space in the schools on the same conditions as similarly situated groups have it." (Tr. at 11)[7] Plaintiffs emphasize that "they seek the access to the school buildings on the same terms and conditions as other community groups, including numerous

---

6. Plaintiffs explained their position:

| | |
|---|---|
| Counsel for Plaintiffs: (Mr. Davidson) | ... [W]e are not talking about the contract period because the city has exercised its right under the partnership agreement to terminate it. We are talking about the circumstances which exist after that agreement has gone away. And no credible claim could be made that the Boy Scouts have waived for all time their constitutional rights. So the question is what those rights are absent any contract. |
| The Court: | So you agree the contract is over, is that right? |
| Counsel for Plaintiffs: (Mr. Davidson) | Yes. It only has sort of an artificial life at the moment as an alternative to a preliminary injunction, as Your Honor mentioned at the outset. |
| The Court: | So what you really are litigating is from this point forward as if you were a new applicant coming to the school board asking to use their space? |
| Counsel for Plaintiffs: (Mr. Davidson) | That's correct, Your Honor. |

(Tr. at 18–19).

7. As noted above, Defendants in Response to Plaintiff's Motion for a Preliminary Injunction argue that Plaintiffs waived their right to freedom of expressive association in its relationship with the School Board of Broward County when they entered into the "Partnership Agreement Between The School Board of Broward County and The South Florida Council of Boy Scouts of America," which included a non-discrimination policy. (Def. Resp. at 12.) Because of Plaintiffs' agreement that the Board was authorized to terminate the Partnership Agreement and that only continued access to the school facilities is being sought, we will not review the waiver argument.

groups which obviously discriminate on grounds described in the school's so called anti-discrimination policy." (*Id.* at 13) In addition to having access to the schools' facilities, Plaintiffs also request access to use school buses on the same basis as other youth groups and as provided by Florida statute. (*Id.* at 14) In response, Defendants affirmed their position that the Partnership Agreement between the parties is no longer valid. Defendants also noted that if the Boy Scouts were to seek a Lease Agreement, the option now available to the Plaintiffs, they would still have to follow Broward County School Board Policy 1341 on non-discrimination.[8] (*Id.* at 26). Plaintiffs claim that to exclude them from after-hours use of school facilities based on the School Board's non-discrimination policy violates the First and Fourteenth Amendments.

## III. STANDARD FOR INJUNCTIVE RELIEF

In reviewing Plaintiffs' request for injunctive relief, we apply the traditional four-factor test which requires Plaintiffs to demonstrate: '(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if

issued, the injunction would not be adverse to the public interest.' *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998) (citing *All Care Nursing Serv. Inc. v. Bethesda Memorial Hosp.*, 887 F.2d 1535, 1537 (11th Cir.1989)). Under our caselaw, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to the four requisites.' *Id.* 'The burden of persuasion in all of the four requirements is at all times upon the plaintiff.' *Snook v. Trust Co. of Georgia Bank of Savannah, N.A.*, 909 F.2d 480, 483 (11th Cir.1990) (citations omitted).

## IV. ANALYSIS AND CONCLUSIONS OF LAW

As the Supreme Court has stated, education is perhaps the most important function of state and local government. Public education "is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Local education officials may attempt "to promote civic virtues," and use "public schools [to] ... inculcate fundamental values necessary to

---

8. At the hearing, Defendants argued:

| The Court: | Are you saying then if [the Boy Scouts] were to apply for, if [the Boy Scouts] were to seek to lease facilities the way the Seventh Day Adventists and some of these other groups do it, can [the Boy Scouts] do that? Will the Boy Scouts be permitted to lease the space? |

| Counsel for Defendants: (Mr. Rogow) | Only if they abide by the school board's nondiscrimination policy, Policy 1341 which prohibits discrimination on a |

series of grounds, including sexual orientation...

| The Court: | so you think—your position is that either, whether they had a partnership agreement or not or whether they were just leasing space, unless they can abide by the nondiscrimination policy, they can't get space, is that right? |

| Counsel for Defendants: (Mr. Rogow) | That's correct ... |

the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 77, 78, 99 S.Ct. 1589, 1594–96, 60 L.Ed.2d 49 (1979). "The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986).

■ The public educator's task is both weighty and delicate. It demands particularized and subjective choices among diverse curricula, moral values, and political stances. The federal courts have traditionally reserved the "daily operations of school systems" to the states and their local school boards. *See Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Nevertheless, the constitutional rights to freedom of speech or expression are not shed at the school house gate. *See Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). State-operated schools may not be enclaves of totalitarianism. *See id.* at 393 U.S. at 511, 89 S.Ct. at 738. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. *See Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). In furtherance of this end, the Supreme Court has not hesitated to intervene when decisions by school officials run afoul of the Constitution. *See, e.g., Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)(striking state statute that forbade teaching of evolution in public school unless accompanied by instruction on the theory of "creation science"); *Board of Educ. v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982)(holding that school board may not remove books from library shelves merely because it disapproves of ideas they express); *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)(concluding that a public school may not compel a student to salute the American flag).

In this case, the School Board argues that it has a compelling interest in protecting the students and teachers (who may wish to be Scout leaders) in the Broward public schools from the emotional harm that would occur from their exclusion from Boy Scout activities on school property solely because of their sexual orientation. The Board also argues that it has a compelling interest in eradicating discrimination so that, by example, their students are taught respect and tolerance. A School Board member, Paul Eichner, stated at the November 14, 2000 School Board meeting, "students learn what they live." Other members of the Board commented at the meeting that it was important for them to send a message.

■ Under the law, there is no question that when government is the speaker, it may make content-based choices. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 2518, 132 L.Ed.2d 700 (1995). For instance, when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. *See Rust v. Sullivan*, 500 U.S. 173, 194, 111 S.Ct. 1759, 1773, 114 L.Ed.2d 233 (1991). In addition, when the government disburses public funds to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled or distorted by the grantee. *See id.*, at 196–200, 111 S.Ct. at 1774–1776. In the context of public education, when a school board determines the content of the education it provides, it is itself speaking. A school board therefore may determine the content of

what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. Under our constitutional structure, a school board that speaks to promote its own policies or to advance a particular idea is, in the end, accountable to the electorate and the political process for its advocacy. *See Board of Regents of Univ. of Wisconsin System v. Southworth,* 529 U.S. 217, 234, 120 S.Ct. 1346, 1357, 146 L.Ed.2d 193 (2000).

Consequently, in this case, the Board, in its disapproval of intolerance towards homosexuality, is free to fashion its own message. It need not assist the Boy Scouts in the solicitation of members through "scouting days" or in any other affirmative acts to "enhance the involvement of this group in the schools" as set forth in the Partnership Agreement. The Board also need not embrace or endorse the Boy Scouts' expression and indeed may fashion its own contrary message.

■ However, in expressing its own message and setting its example for students to follow, the School Board cannot punish another group for its own message.[9] The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restrictions. *See Perry Ed. Assoc. v. Perry Local Educator's Assoc.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

In *Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), the Supreme Court held that the application of New Jersey's nondiscrimination law, requiring Boy Scouts to appoint an avowed homosexual as an Assistant Scoutmaster, ran "afoul of the Scouts' free-

dom of expressive association." *Id.* at 2455. In addressing the question of whether forcing the inclusion of Dale would "significantly affect Boy Scouts' ability to advocate public or private viewpoints, *id.* at 2452, the Court found that Dale's presence would significantly burden the Boy Scouts' desire to not 'promote homosexual conduct as a legitimate form of behavior.'" *Id.* at 2453. The School Board concedes that the Boy Scouts have a First Amendment right to freedom of expressive association, which includes the right to exclude homosexuals as members or leaders in the organization.

■ Yet it is because of the exercise of this right and publicity about the Supreme Court decision that the School Board seeks to bar the Boy Scouts from use of school facilities. There is no question that the School Board, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 390, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993). However, once the state has opened a limited public forum, it may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum," *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 804–804, 105 S.Ct. 3439, 3450–51, 87 L.Ed.2d 567 (1985), nor may it discriminate against speech on the basis of its viewpoint, *see Lamb's Chapel, supra* at 392–93, 113 S.Ct. at 2147. Here, the School Board concedes that in allowing a multitude of groups to use its facilities on a regular basis, it has created a limited public forum. (Tr. at 22, 75–76.)

The facts of this case therefore bring it very close to the decision of the former

---

**9.** Counsel for the Boy Scouts acknowledged at Oral Argument that the Board was free to exercise its judgment and refuse to endorse or embrace participation by the Boy Scouts in the schools. (Tr. 13–14, 60–61, 63.)

Fifth Circuit in *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 578 F.2d 1122 (5th Cir.1978). There, our predecessor Court of Appeals ordered a preliminary injunction against a school board's policy denying the Ku Klux Klan the use of a high school gymnasium for what the Klan termed a patriotic meeting on a Saturday morning. The court framed the issue on appeal as follows: may an agency of the state, consistently with the Constitution, condition the off-time use of public school facilities on the political or ideological views of the applicant, on its membership policies, or perhaps on who may be permitted to attend? The school board had argued that the rally would impede desegregation of the parish schools and involve the state in forwarding the KKK's invidious views.

The former Fifth Circuit found these arguments unavailing in the face of the constitutional guarantees of freedom of speech and association. The court noted, "[t]he benefits of the First Amendment are often hard to see, its gifts frequently unwelcome to the majority of the time, but the interest that thinks to make head against it must be a compelling one indeed." *Id.* at 1126. As for fears of the perception of state involvement in the rally because of use of the school facility, the court opined: "the state is here no more involved in or responsible for the views expressed or for the composition of the groups which express in the forum it creates than the United States is in who makes speeches or holds demonstrations in the mall." *Id.* at 1128. Instead, the court decided, "it is appellees who would have

the state take a hand in the matter by franking those whose ideas and policies it finds suitable for public expression and gagging those it does not and this in the name of equal protection and civil rights." *Id.; see also Cuffley v. Mickes,* 208 F.3d 702 (8th Cir.2000), *cert denied sub nom; Yarnell v. Cuffley* —— U.S. ——, 121 S.Ct. 1225, 149 L.Ed.2d 135 (2001)(finding that the State may not deny access to its Adopt–A–Highway program based upon KKK's beliefs and advocacy).[10]

In seeking to distinguish the facts here from those considered by the former Fifth Circuit in the *Ku Klux Klan* case, the School Board makes two primary arguments.

■ First, it is argued that the pervasiveness of the use of the school facilities makes this case different, pointing to the language of the KKK case that "the occasional and temporary use" of the facilities does not constitute state action, 578 F.2d at 1127. In fact, counsel for the School Board suggested that if only one Boy Scout troop wanted to use the facilities the Board would be powerless to act. This argument does not seem persuasive however. I find no support for the proposition that the number of participants or the frequency of use changes public forum analysis. Unless the private use were to be in actuality a subterfuge where a public body utilized private groups to perpetuate discrimination, the frequency of use lacks significance. *See Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).

10. The Eighth Circuit concluded: "There are better ways of countering the Klan's repellent philosophy than by the State's engaging in viewpoint-based discrimination. In a myriad of constitutionally sound ways, state officials and private citizens alike may oppose the Klan's racially divisive views and express dis-

approval of those views in the strongest terms. But viewpoint based exclusion of any individual or organization from a government program is not a constitutionally permitted means of expressing disapproval of ideas— even very poor ideas—that the government disfavors."

Second, the Board argues that the fact that the Boy Scouts unlike the Klan primarily draws members and scout leaders from the student body and the teachers of the schools, gives it a compelling interest in stopping discrimination against those with whom it has a special relationship and duty. Boys might be excluded in the evenings from schools they attended that morning and teachers might be excluded from the school at which they teach. It is argued that the Board has a compelling interest in protecting these students and teachers from the emotional harm they might suffer from exclusion. This concern is understandable. The emotional hurt that such an event could cause may be a reason for parents and young men to disassociate themselves from participation in scouting. It may also be a reason for the Boy Scouts to reconsider their policy. But the hurt of exclusion is part of the price paid for the freedom to associate. I do not see how this hurt differs from that of the African–American student whose school gymnasium is used for a Klan rally, the Holocaust survivor forced to contemplate the Nationalist Socialist Party parading through the streets of Skokie, Illinois wearing swastikas, the gays or lesbians who are refused a place in the St. Patrick's Day parade, or James Dale's pain after being excluded from scouting after 12 years of active and honored participation.[11] Freedom of speech and association has its costs, and tolerance of the intolerant is one of them.

A specialized First Amendment jurisprudence has developed around secondary and elementary schools, reflecting the unique institutional function of school facilities in the community and in our society. *See Hazelwood Sch. Dist. v. Kuhlmeier,*

484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The Supreme Court has recognized that First Amendment rules in the public schools must be "applied in light of the special characteristics of the school environment." *See Tinker, supra* at 506, 89 S.Ct. 733. Specifically, the Court has held that "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *See Hazelwood* 484 U.S. at 267, 108 S.Ct. at 568. However, unlike cases where the Court has given schools more control over their own message and teachings, *see id.,* here, we are dealing with a limited public forum created by the School Board itself. Further, the speech the School Board wishes to regulate is not student speech taking place during school hours, but rather the speech of a private organization wishing to exercise its expressive association rights during non-school hours. *See id.*

 Moreover, the action taken by the School Board barring the Boy Scouts from use of school facilities does nothing to stop the possible exclusion of students or teachers from scouting. If its purpose is to stop discrimination, the method chosen by the Board is ineffective. Under the law, when government seeks to regulate speech based upon its content, the regulation must achieve the stated governmental purpose, it must be narrowly tailored, and it must be the least restrictive alternative available. *See Ward v. Rock Against Racism,* 491 U.S. 781, 798 n. 6, 109 S.Ct. 2746, 2758 n. 6, 105 L.Ed.2d 661 (1989). For the reasons outlined earlier, I do not believe excluding the Boy Scouts from Broward school facilities based on their anti-gay

---

**11.** *See Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd., supra; National Socialist Party of America v. Village of Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96

(1977); *Hurley v. Irish–American Gay, Lesbian, and Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); *Boy Scouts of America v. Dale, supra.*

viewpoint can pass constitutional muster under this standard.

The disposition of this case is controlled by the answer to the first prong of the preliminary injunction test, whether Plaintiffs have shown a substantial likelihood of success on the merits. The School Board's action barring the Boy Scouts from its facilities is a response to membership policies declared by the Supreme Court to be protected by the First Amendment. Under the facts presently before this court, the Boy Scouts have shown a substantial likelihood of success on the merits. Counsel for the School Board agreed at the hearing on the request for injunction that a First Amendment violation would constitute irreparable harm. (Tr. at 72). Moreover, since the Boy Scouts' have used the facilities for many years and other groups continue to enjoy access, the threatened injury to the Plaintiffs outweighs any threatened harm the proposed injunction may cause the Defendants. *See East Baton Rouge Parish Sch. Bd.,* 578 F.2d at 1126–27. Finally, enjoining a selective denial of a dedicated public forum to a group because of its membership policies would forward and not contravene the public interest. *Id.* at 1127.[12]

## V. CONCLUSION AND ORDER

For the foregoing reasons, and because the Boy Scouts have met all four prongs of the test for granting a preliminary injunction, it is hereby

ORDERED and ADJUDGED that an injunction shall issue, pending the hearing on the merits. The Defendants, their agents, employees, and successors in office are enjoined from preventing the Boy Scouts from using Broward County public school facilities and buses during the off school hours by reason of the Boy Scouts' membership policy. This injunction shall not apply to activities of the Boy Scouts constituting "involvement" of the group in the schools as provided in the terminated Partnership Agreement. This injunction shall not be construed to require the Defendants to endorse, participate, or solicit others to participate in Boy Scouts activities.

*See Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300 (1978); *see also Carillon Importers v. Frank Pesce Int'l. Group Ltd.,* 112 F.3d 1125 (11th Cir.1997).

---

12. Defendants have not requested security, as provided by Federal Rule of Civil Procedure 65(c). Since there is no risk of financial harm, there is no necessity for posting of security under the circumstances of this case.